# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-24818-CIV-MARTINEZ/GOODMAN

JAMIE BRYANT, et al.

     Plaintiffs,

v.

WAL-MART STORES, INC., et al.

     Defendants.

_____/

## REPORT AND RECOMMENDATIONS ON
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This Report and Recommendations concerns a class certification motion filed by three plaintiffs who seek to represent a class of former Wal-Mart Stores, Inc. employees who participated in the Walmart Associates' Health and Welfare Plan. They filed this lawsuit against Walmart[1] (and, in their Second Amended Complaint, also against the Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan) under ERISA § 502(c)(1), 29 US.C. § 1132(c)(1). Plaintiffs claim they were injured by

---

[1] According to a press release from Walmart, "Wal-Mart Stores, Inc." is the legal trade name of the corporation." Jane Wells, *Wal-Mart? Wal\*Mart?? Walmart???* (Aug. 2, 2010), https://www.cnbc.com/id/32403443. The "name 'Walmart,' expressed as one word and without punctuation, is a trademark of the company and is used analogously to describe the company and its stores." *Id.*

the receipt of a COBRA[2] election notice because it provided contact information for the Plan's COBRA administrator but not for the administrator of the Plan itself. Specifically, Plaintiffs say the notice did not properly identify the administrator, including its name, address and telephone number. They allege that this defective notice violated the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by COBRA.

At bottom, Plaintiffs' Second Amended Complaint seeks statutory penalties (of $110 per day), declaratory relief and equitable relief (e.g., an injunction preventing Defendants from continuing to use the purportedly defective COBRA notice and requiring them to send new ones). Their motion for class certification [ECF No. 99] asks for an Order certifying two classes: (1) all participants and beneficiaries in the health plan who were sent a COBRA notice from January 6, 2016 to December 14, 2016, as a result of a qualifying event, and who did not elect continuation coverage; and (2) an identical class -- but involving COBRA notices sent from June 1, 2013 to January 25, 2016.

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3) -- that common questions of law or fact predominate and that the class action is superior to other methods of processing the case. United States District Judge Jose E. Martinez referred the class certification motion to the Undersigned. [ECF No. 101].

After Plaintiff Jamie Bryant filed the class certification motion, the following submissions concerning class certification or the standing argument argued in the class

_____

[2]	COBRA refers to the Consolidated Omnibus Budget Reconciliation Act.

action motion were filed:

- Walmart filed an opposition response. [ECF No. 106].

- Bryant filed a reply. [ECF No. 107].

- Walmart filed a Court-authorized sur-reply. [ECF No. 113].

- Plaintiffs filed a Second Amended Class Action Complaint, adding two
additional Plaintiffs (Dawn Smith and Curtis Baker) and adding an additional Defendant
(Administrative Committee of the Walmart Stores, Inc. Associates' Health and Welfare
Plan). [ECF No. 145].

- Plaintiffs filed a summary judgment motion on liability and Article III
Standing. [ECF No. 152].

- Defendants filed their own summary judgment motion, with the standing issue
as the primary, lead argument. [ECF No. 154].

- As amicus curiae, the Retail Litigation Center, Inc. submitted a memorandum
of law which included a separate section on Plaintiffs' purported lack of standing.[3] [ECF
No. 159-1].

So the class certification motion is fully briefed.

For the reasons outlined in greater detail below, the Undersigned **respectfully
recommends** that Judge Martinez **deny** (albeit without prejudice) the class certification

---

[3]     Other amicus curiae submitted briefs, but they focused on issues other than
standing.

motion. [ECF No. 99]. Specifically, the Undersigned recommends that Judge Martinez conclude that the three named Plaintiffs lack standing to bring this purported class action lawsuit. In addition, as an alternative ground, the Undersigned recommends that Judge Martinez conclude that the three Plaintiffs do not meet the typicality requirements for one of the two subclasses.

## I.      FACTUAL BACKGROUND

Bryant holds a master's degree in human resources from Webster University. [ECF No. 155-2 (Bryant Depo.)]. She began at Walmart as an assistant store manager in 2009, became co-store manager in 2011, and was the full sole store manager from 2014 until her employment with Walmart ended in 2016. *Id.* at ¶¶ 25:2-26:7.

Bryant called Walmart Benefits and spoke to a representative on March 29, 2016, before her employment with Walmart ended, "to be proactive before losing benefits." *Id.* at ¶¶ 80:9-81:8, 82:1-4, 82:20-83:19, 84:6-17. On the March 29, 2016 call to Walmart Benefits, Bryant was told she had 60 days (until June 7, 2016) to enroll under her then-domestic partner's Walmart health insurance. *Id.* at ¶¶ 84:6-85:4, 102:6-103:4.

During that same March 29, 2016 call, the Walmart representative told Bryant that her healthcare coverage through her domestic partner would be effective retroactively to her date of termination so that there was no break in coverage. *Id.* at ¶¶ 84:19-85:4, 102:6-103:4.

4

On the March 29, 2016 call to Walmart Benefits, Bryant was advised that she could enroll in her domestic partner's plan on the day after her employment ended, and she understood that "it's best to [enroll in domestic partner coverage] like the very next day" after her termination. *Id.* at ¶¶ 102:6-103:6-17, 104:13-24. Bryant was also told that her domestic partner's total premium payment for HRA family coverage would be $116.50 per pay period (or $3,029 per year based on 26 pay periods) if she added herself and her children to his Plan coverage. *Id.* at ¶¶ 99:16-100:7.

Based on the annual premium of $3,029 for HRA Plan family coverage, the monthly premium payment for HRA family coverage would be $252.42 for Plaintiff Bryant and her children to be added to her domestic partner's Plan coverage. [ECF No. 155-4 (Decl. of Cherri McClure)].[4]

Bryant's domestic partner's Plan coverage before Bryant and her children were added to his coverage as beneficiaries was $37.20 per pay period (which is $967.20 per year and $80.60 per month). The addition of Bryant and her children resulted in an increase of $171.82 in monthly cost to Bryant's domestic partner for family coverage for the HRA Plan. *Id.*

On March 29, 2016, when Bryant contacted Walmart Benefits, she was told that a tax was applied to the cost for Bryant to be added to her domestic partner's healthcare

---

[4]     Ms. McClure is the Senior Director, Total Rewards Administration, Human Resources at Walmart.

coverage because Bryant and her domestic partner were not legally married at the time. [ECF No. 155-2, ¶¶ 48:25-49:5, 85:24-87:20]. The tax is on income imputed to Bryant's domestic partner. The imputed income was $123.55 per pay period or $3,212.30 annually. Assuming the highest federal tax rate of 39.6%, this would have resulted in a maximum annual tax to Bryant's family of $1,272.07. [ECF No. 155-4].

While she was a Walmart associate, Bryant paid $105.50 per pay period for the HRA High Plan for herself and her two children. That is equal to $2,743 annually or $228.58 per month. The combined total cost for Plan coverage for Bryant, her domestic partner, and their children while Bryant was a Walmart associate was $3,710.20. Therefore, although the coverage option was different, the total cost of coverage to Bryant, her domestic partner, and their children actually decreased when Bryant left Walmart and became a dependent on her domestic partner's coverage. *Id.*

Bryant did not attempt to enroll in her domestic partner's plan between April 13 and April 21, 2016. [ECF Nos. 155-5; 33-2; 155-2, ¶¶ 146:1-147:15, 174:4-25]. Bryant testified that "I still had to determine which plan would be the best for my family so up until making that determination, I had no coverage." [ECF Nos. 155-2, ¶¶ 115:13-22; 155-1].

Bryant further testified that "we held off on initial coverage, like they gave us some options, but it was going to -- they were taxing us because at the time we weren't married." [ECF No. 155-2, ¶¶ 19:21-20:12].

Bryant's domestic partner had "follow-up questions" about the applicable taxes and "a couple of different things" before Bryant enrolled in his insurance. *Id.* at ¶¶ 170:6-171:20.

Bryant's health insurance coverage through the Walmart Associates' Health and Welfare Plan ("Plan") continued until April 13, 2016. *Id.* at ¶¶ 43:14-44:2.

Bryant enrolled in her domestic partner's Walmart healthcare coverage on or between April 21, 2016 and April 28, 2016. [ECF No. 155-5]. Her healthcare coverage under her domestic partner's Walmart plan was effective retroactively to her date of termination of April 13, 2016. [ECF No. 155-2, ¶¶ 30:5- 31:10].

A COBRA election notice was sent to Bryant on April 28, 2016. [ECF No. 18-2]. Although she does not recall the specific date, Bryant received the COBRA election notice after April 28, 2016. [ECF No. 155-2, ¶¶ 34:1-17].

The COBRA election notice that Bryant received stated that coverage under her Walmart healthcare plan would end on April 13, 2016, and that, if she elected COBRA coverage, her COBRA coverage would begin on April 14, 2016, and Bryant understood this at the time she received the COBRA notice. [ECF Nos. 155-2, ¶¶ 65:3-66:1; 18-2, pp. 1, 2].

The COBRA election notice Bryant received stated: "[I]f you elect coverage through the Marketplace, you may experience a gap in coverage between the date you lose coverage under the group health plan and the date coverage through the

Marketplace begins (whereas, you will not experience a gap if you elect and pay for COBRA continuation coverage)." [ECF No. 18-2, p. 2].

"The structure of COBRA is designed for there to be a temporary gap even when a timely COBRA election is made, and then **the gap is closed retroactively once the election is made** and the COBRA premiums are paid." [ECF No. 155-6, ¶ 24 (Expert Report of Roberta Casper Watson) (emphasis added)].

COBRA continuation coverage would have cost Bryant $1,145.89 each month or $13,750.68 annually. [ECF No. 18-2, p. 3]. Bryant's annual COBRA coverage would have been well in excess of the annual cost her domestic partner paid for health coverage and additional taxes. [ECF No. 155-4].

### a.  The COBRA Election Notice

The Plan was established and maintained pursuant to the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan Wrap Document ("Wrap Document"), which designated the Administrative Committee (the "Committee") as the "'Administrator' as defined in Section 3(16)(A) of ERISA." [ECF No. 155-7, p. 5].

The Executive Committee of the Board of Directors of Wal-Mart Stores, Inc. approved the amendment and restatement of the Plan's Wrap Document by a unanimous consent resolution in 2005. [ECF No. 155-9].

The Wrap Document authorized the Committee to delegate plan administration responsibilities to third parties:

> Except where responsibilities have been assigned to a Third Party Administrator, insurer or another fiduciary, or are otherwise delegated as permitted under the terms of the Plan, the Administrative Committee shall have the general responsibility for the administration of the Plan and for carrying out its provisions as follows:
>
> . . .
>
> (c) The Administrative Committee shall have all other duties and powers necessary or desirable to administer the Plan, including, but not limited to, the following:
>
> (7) To appoint, discharge and periodically monitor the performance of Third Party Administrators, insurers, service providers and other agents in the administration of the Plan; . . .

[ECF No. 155-7, p. 17].

The Plan administrator and the Administrative Committee entered into a services agreement that delegated the responsibility for administering COBRA benefits under the Plan to a third-party COBRA administrator, CONEXIS. [ECF Nos. 155-10, p. 1; 155-7, ¶¶ 17:13-18].

The Fifth Recital of the CONEXIS Agreement states that "the AHWP has determined that it is in the best interest of the participants and their beneficiaries . . . to retain [CONEXIS] for the purpose of administering its health care continuation coverage according to the terms set out in Section 3 of this Agreement." [ECF No. 155-10, p. 1].

The CONEXIS Agreement recognized that CONEXIS is in the business of administering COBRA on behalf of group health plans and that it can "better defray the costs of administering the AWHP." *Id.*

It is "nearly universal . . . for employers to outsource COBRA administration." [ECF No. 155-6, ¶ 13].

"COBRA is complicated, and it is usually preferable to engage an administrator that is in the business of mastering and applying COBRA's rules rather than for each employer to separately have its own workforce trained to handle those responsibilities in addition to their other duties." *Id.*

The 2016 Associate Benefits Book, which is the summary plan description for the Plan, states that "[t]he Plan contracts with CONEXIS to administer COBRA" and refers to CONEXIS as the party to whom COBRA questions, enrollment elections, and premium payments should be directed. [ECF No. 155-11, pp. 107-113].

When COBRA administration is being done in the name of the COBRA administrator, it is typical for the COBRA election notice to include and emphasize the identity and contact information for the COBRA administrator in lieu of that of the Plan Administrator. [ECF No. 155-6, ¶ 17].

The COBRA election notice sent to Plaintiffs Bryant, Baker, and Smith contained contact information for the COBRA administrator, CONEXIS. [ECF No. 18-2].

The COBRA election notice provided at the top of page 2: "If you have any questions about this notice or your rights to COBRA continuation coverage, you should contact CONEXIS at (800) 570-1863, or refer to the COBRA section in your Associate Benefits Book." *Id.*; [ECF No. 155-2, ¶¶ 67:16-68:18].

The COBRA election notice provided on page 10: "If you have any questions concerning the information in this notice or your rights to coverage, you should contact CONEXIS at (800) 570-1863. To request a copy of your Associate Benefits Book, you should contact Walmart Benefits at (800) 421-1362." [ECF Nos. 18-2, p. 10; 155-2, ¶¶ 76:7-77:5].

Plaintiff Bryant testified that she understood the portions of the COBRA election notice directing her to contact CONEXIS with COBRA-related questions. [ECF Nos. 18-2; 155-2, ¶¶ 67:15-68:7, 76:7-19].

The COBRA notice indicates that recipients may contact Walmart Benefits to request a copy of the Associate Benefits Book, which contained information concerning COBRA. [ECF Nos. 18-2, p. 10; 155-2, ¶¶ 76:7-77:5].

The "Walmart Notice is extremely typical." [ECF No. 155-6, ¶ 15].

"The purpose of the COBRA notice requirements is to make sure that the qualified beneficiaries have sufficient information to exercise their COBRA rights so as to be able to purchase COBRA coverage within the required time frames." *Id*.

The COBRA election notice "provided information that would be appropriate and best for the Plan participant in order to get information about how to access COBRA benefits." [ECF No. 155-8, ¶¶ 38:10-12].

It is "predictable that an individual qualified beneficiary may have questions as to how the COBRA rules apply to the specific circumstances of that qualified beneficiary." [ECF No. 155-6, ¶ 16].

Where the COBRA administration is outsourced, "it is very important that the qualified beneficiaries be told specifically where they should turn to seek additional information, and the source of that additional information for such plans is virtually always the COBRA administrator." *Id*.

"[T]he COBRA administrator will be ready and able to answer questions about COBRA rights, whereas most of the benefits staff for the Plan Administrator **may not have the same expertise in the details of COBRA**." *Id*. (emphasis added).

CONEXIS maintained its own call center. [ECF No. 155-4, ¶¶ 41:5-9]. If individuals contacted the Walmart post-qualifying event benefits Contact Center with questions relating to COBRA coverage, Walmart would direct those individuals to CONEXIS, and Walmart Contact Center employees are instructed to do so in training. [ECF No. 155-4, ¶¶ 17:1-20, 33:11-25, 41:10-42:4].

The inclusion in the COBRA notice of information relating to the administrator for the Plan "would be irrelevant and **potentially confusing** for the qualified beneficiaries." [ECF No. 155-6, ¶ 17 (emphasis supplied)].

### b.  Consequences to Bryant

Bryant could not recall any medical expenses or costs that she incurred between April 14 and April 28, 2016. [ECF No. 155-2, ¶¶ 31:18-32:6]. Bryant is not seeking to recoup unpaid medical expenses in this lawsuit. [ECF Nos. 155-5 (No. 2); 18].

Bryant claimed that she suffered economic injury "in the form of higher insurance premiums she had to help her boyfriend pay as a result of losing her own insurance." *Id.* at No. 1.

But Bryant could not recall the amount of premiums under her Walmart plan, or the amount of premiums when she elected coverage under her domestic partner's plan. [ECF No. 155-2, ¶¶ 37:5-25, 89:1-91:13].

Similarly, Bryant could not recall whether she had in fact paid higher premiums on her domestic partner's plan versus her own Walmart plan. *Id.* at ¶¶ 37:5-25, 89:1-91:13].

Bryant attributed the "change in cost" for her to be added to her domestic partner's insurance to two factors: the fact that she (an additional adult) was added to her domestic partner's coverage, and a tax that was imposed upon her coverage under her domestic partner's insurance. *Id.* at ¶¶ 48:25-49:5.

Enrolling Bryant's children in her domestic partner's health insurance did not cause the cost to increase. *Id.* at ¶¶ 48:9-24.

Bryant could not identify whether the household expenses when she was added to her domestic partner's insurance were higher, lower, or the same as the household expenses when Plaintiff maintained her own Walmart health insurance. *Id.* at ¶¶ 93:12-94:24.

Bryant is not seeking to recoup increased insurance premiums in this lawsuit. [ECF No. 18].

Although Bryant claimed that her daughter had to forego surgery as a result of the deficient COBRA notice, Bryant's daughter did not have said surgery until 2018. *Id.* at ¶¶ 144:17-20.

### c.   Bryant Requested Evidence of a "Lapse" in Her Coverage

On March 21, 2017, Bryant called Walmart Benefits and requested a document showing a lapse in coverage because she "need[ed] to be able to show that there was an actual gap in [her] coverage." *Id.* at ¶¶ 146:1-7, 148:20-149:3, 149:12-25.

On March 23, 2017, Bryant submitted to the Court a declaration attaching as Exhibit B the document that she had received in response to her request on March 21, 2017, as evidence "that [she] had a lapse in coverage." [ECF Nos. 33-1, ¶ 13; 33-2; 155-2, ¶¶ 110:5-14, 149:12-25].

Exhibit B to Plaintiff's Opposition to Walmart's Motion to Dismiss states that Bryant "completed online enrollment session on 04/21/16 for coverage to be effective 04/08/16." [ECF Nos. 33-2; 155-2, ¶¶ 109:6-110:14].

At the time she submitted the declaration, Bryant understood that her coverage had been effective retroactively to the day after her coverage as a Walmart associate terminated. [ECF No. 155-2, ¶¶ 110:5-117:9].

### d.  Plaintiffs Dawn Smith and Curtis Baker

While Smith incurred approximately $1,000 in unpaid medical bills in the months following her termination from Walmart, she knew before she received her COBRA election notice that she could not afford COBRA coverage. [ECF No. 155-13, ¶¶ 20:1-20, 28:8- 15, 32:2-11, 33:15-34:21, 69:4-71:18, 73:2-6, 78:2-8].

Smith did not feel the need to obtain more information about COBRA continuation coverage because she "wasn't going to go with COBRA anyway." *Id.* at ¶¶ 79:25-80:16.

There is no evidence that Smith attempted to contact the COBRA Administrator with questions about the notice or her COBRA rights. *Id.* at ¶¶ 20:12-18, 28:8-15, 32:2-11, 34:17-21, 72:1-8, 73:2-6.

Baker did not read the entirety of his COBRA election notice when he received it, but he could not afford COBRA coverage. [ECF No. 155-14, ¶¶ 74:12-78:5, 80:7-81:22].

Baker did not have any unpaid medical expenses, nor did he forego medical care, during the period he was without health coverage. *Id.* at ¶¶ 16:14-17:8.

Baker was terminated from Walmart and, due to his anger and hurt upon his termination, wanted nothing more to do with Walmart, including signing up for COBRA. *Id.* at ¶¶ 23:2-14, 43:15-44:12, 44:18-45:13.

Baker was unable to explain the injuries he and other putative class members incurred, other than discussing the various disadvantages to being without health coverage. *Id.* at ¶¶ 59:2-14, 60:4-19.

## II.   PROCEDURAL BACKGROUND

Bryant filed her class action lawsuit against Wal-Mart Stores, Inc. [ECF No. 1], which filed a motion to dismiss [ECF No. 14]. The motion to dismiss challenged Bryant's Article III standing and also argued that she failed to state a claim upon which relief can be granted. Walmart's motion described the claim as "much ado about nothing" and contends that the COBRA notice she received, on its face, satisfies the legal requirements Bryant relies upon for her theory. [ECF No. 14, p. 2]. Bryant filed a First Amended Complaint. [ECF No. 18].

Among other arguments, Walmart contended that the applicable regulations do not require identification of the Plan Administrator; they required identification only of the "party responsible under the plan for the administration of continuation coverage benefits." *Id.* at p. 15. It noted that Bryant pointed to no legal authority requiring that the "party responsible under the plan for the administration of continuation coverage benefits" must be the Plan Administrator. *Id.* Therefore, Walmart argued, CONEXIS is the party responsible for administration of COBRA benefits, and the COBRA notice provided correct contact information about CONEXIS.

Judge Martinez's ruling denied in part and granted in part the motion to dismiss. [ECF No. 64]. Concerning standing, Judge Martinez denied the dismissal motion "based on the record currently before this Court," and noted that Bryant "at this juncture" had "sufficiently alleged a concrete and particularized injury in which she suffered actual harm via her alleged temporary loss of insurance coverage." *Id.* at p. 6. In doing so, Judge Martinez noted that he "must accept Plaintiff's allegations [about her loss of medical insurance] as true [at] this stage in the proceedings." *Id.*

Concerning the COBRA notice itself, Judge Martinez determined that Defendant's inclusion of the COBRA administrator's contact information (instead of the information for the plan administrator) "does not satisfy" the applicable regulatory requirements of 29 C.F.R. § 2590.606-4(b)(4)(i), and the Court denied the dismissal motion concerning that regulation. *Id.* at p. 9. The Court also determined that the COBRA notice, which omitted the contact information for the plan administrator, is not "sufficient to permit the discharged employee to make an informed decision whether to elect coverage." *Id.* at p. 11.[5]

Walmart filed a motion for reconsideration, or, in the alternative, to certify an interlocutory appeal. [ECF No. 71]. Walmart alleged that the Court erred in concluding that Walmart violated the COBRA election notice requirements established in 29 C.F.R.

---

[5]     Judge Martinez denied the dismissal motion concerning sections 2590.606-4(b)(4)(iv) and (vi).

§ 2590.606-4(b)(4), and it contended that notice requirements are satisfied by proving information for CONEXIS, the Plan's COBRA administrator. It also pointed out that the model notice included in the regulation authorizes the practice and language it used.

The Court denied the reconsideration/interlocutory appeal motion on June 8, 2020. [ECF No. 126].

## III.   APPLICABLE LEGAL STANDARDS

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citation omitted). "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350. "In other words, 'the party seeking class certification has a burden of *proof*, not a burden of pleading.'" *Reyes v. BCA Fin. Servs.*, No. 16-cv-24077, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018) (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)).

In evaluating compliance with Rule 23, courts begin by determining "whether the proposed class has been adequately defined and is ascertainable." *Reyes*, 2018 WL 3145807, at *9. Courts next consider whether a plaintiff satisfies Rule 23(a)'s prerequisites:

numerosity, commonality, typicality, and adequacy. The class must also satisfy one of the three additional requirements of Rule 23(b).

Here, Plaintiffs assert a class under Rule 23(b)(3) [ECF No. 21, p. 10], which provides that certification is available if a court finds "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). "The predominance inquiry . . . is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citation omitted).

### a.  Standing (general principles)

Article III vests the judicial power in the federal courts and extends that power to "Cases" and "Controversies." U.S. Const. art. III, §§ 1-2. One tool for determining that the matters before us are truly cases or controversies, as understood by Article III, is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Even when those political branches appear to have granted us jurisdiction by statute and rule, we are still obliged to examine whether jurisdiction exists under the Constitution.

As the Supreme Court has explained, the "irreducible constitutional minimum" to establish Article III standing requires three elements. *Lujan*, 504 U.S. at 560. "The plaintiff

must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61).

To establish "injury in fact," a plaintiff must show that he or she suffered an "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). For the injury to be "concrete," it must be "real" and not abstract; however, it need not be tangible. *Id.*

When the concreteness of an alleged injury is difficult to recognize, we look to "history and the judgment of Congress" for guidance. *Spokeo*, 136 S. Ct. at 1549. But an act of Congress that creates a statutory right and a private right of action to sue does not automatically create standing; "Article III standing **requires a concrete injury even in the context of a statutory violation.**" *Id.* (emphasis added).[6] "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."

---

[6]     *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) provides insight on this point. *Salcedo* was an interlocutory appeal, reversing a trial court order denying a motion to dismiss a putative class action claim seeking statutory damages of $500 per text message and treble damages of $1,500 per text message based on an alleged TCPA violation because the receipt of a single unsolicited text message is not a concrete injury in fact which establishes standing. Specifically, the Court there explained that a search for concrete harm when assessing Article III standing may in some contexts mean "identifying purely speculative 'harm' that never actually materializes as failing to allege an injury in fact." *Id.* at 1167 n.4.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

These principles apply to class actions. "[I]t is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a) to assert the rights of others." *Id.* at 1280 (internal citation omitted). Thus, district courts have addressed class plaintiff standing early in litigation -- before a motion for class certification has been filed. *See, e.g.*, *Weiss v. General Motors LLC*, No. 19-cv-21442-RNS, 2019 WL 5394621, at *3 (S.D. Fla. Oct. 22, 2019). In the instant case, of course, the Court is evaluating the propriety of class action treatment because a motion for class certification was in fact filed.

The Eleventh Circuit has acknowledged that standing is "perhaps the most important jurisdictional doctrine." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (internal citation omitted). The doctrine "stems directly from Article III's 'case or controversy' requirement." *Id*. (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)). And it "implicates [the] subject matter jurisdiction" of a federal court. *Id*.

Consistent with the rules outlined above, the party seeking certification must demonstrate that the named plaintiffs have standing to bring the claim for which

certification is sought. *See AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019).

### b. Do the Merits Matter on a Class Certification Issue?

While a court may *consider* the factual record in connection with the class-certification requirements, a comprehensive, substantive analysis of the merits of claims or defenses is inappropriate on class certification.  *See* Fed. R. Civ. P. 23(c)(1)(A) advisory committee's note to 2003 amendment ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *Drayton v. W. Auto Supply Co.*, No. 01-CIV-10415, 2002 WL 32508918, at *6 (11th Cir. Mar. 11, 2002); *see also Reyes*, 2018 WL 3145807, at *7. The purpose of a class-certification ruling "is not to adjudicate the case," but "to select the method best suited to adjudication of the controversy." *Amgen*, 568 U.S. at 460 (internal citation omitted). Adjudicating the merits to determine certification "put[s] the cart before the horse." *Id.*

**However,** this overall philosophy does not mean that elements of the claims or defenses are completely *irrelevant* to class certification. Instead, the analysis is limited to whether they are subject to common or individualized proof, not whether a particular claim or defense will ultimately be *successful.* Indeed, the Eleventh Circuit recently held

that it is an abuse of discretion to deny certification based on a "defense [that] raised a question common to all class members." *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 41 F.3d 1031, 1041 (11th Cir. 2019).

The issue on class certification is not whether a claim or defense will *succeed*, but whether the substantive theories are subject to common proof, and, if not, whether it will require "a great deal of individualized proof." *Id.*; *see also id.* at 1042 ("We caution that we express no opinion today about whether Rushmore's defense is meritorious . . . Our decision today is limited to the conclusion that this defense raises questions common to all class members.").

Framed by this language, the Undersigned notes that "if a question of fact or law is relevant to that determination, then the district court has a **duty** to actually *decide it* and **not accept it as true** or construe it in anyone's favor." *Brown*, 817 F.3d at 1234 (emphasis added). Here, the "rigorous analysis" required by Rule 23 "will entail some overlap with the merits of the plaintiff's underlying claim" because "[t]he class determination generally involves considerations that are **enmeshed in the factual and legal issues comprising the plaintiff's cause of action**." *Dukes*, 564 U.S. at 351-52 (citation omitted) (emphasis added).

## IV.    ANALYSIS OF STANDING (DOES ANY NAMED PLAINTIFF HAVE IT?)

Although not technically a Rule 23 prerequisite, "any analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir.

1987).

A district court has wide discretion in deciding whether to certify a proposed class. *Birmingham Steel Corp v. Tenn. Valley Authority*, 353 F.3d 1331, 1335 (11th Cir. 2003). In the exercise of that discretion, it must conduct a "rigorous analysis" in determining whether Rule 23's prerequisites have been met. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). This means the court must **go beyond the pleadings** in order to "understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

At the preliminary stage, the Court should not pass on the merits of the claims, but because the merits and Rule 23's prerequisites are often intertwined, some overlap is unavoidable. *Heffner v. Blue Cross and Blue Shield of Alabama, Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006). Ultimately, if a question of fact or law is relevant to the class certification determination, "then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233-34 (11th Cir. 2016). *See generally New Concept Dental v. Dental Resources Systems, Inc.*, No. 17-CV-61411, 2020 WL 3303064, at *1 (S.D. Fla. Mar. 3, 2020) (denying class certification motion).

The Court's initial ruling on the standing issue was made in the context of a motion

to dismiss, where the allegations are taken as true. The Court did not specifically hold that Bryant does, in fact, have standing. Rather, it simply ruled on a motion to dismiss based on an approach which deemed her allegations to be correct. The current procedural posture -- evaluating a motion for class certification -- is dramatically different, where the Court is permitted, and actually required, to probe the accuracy of the factual allegations.[7] The Court's earlier ruling did not, of course, discuss the standing of Baker and Smith, as they had not yet been formally added as party Plaintiffs at the time.

In any event, Plaintiffs have the burden to establish standing. *Lujan*, 504 U.S. at 561.

The entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, "the party with the burden of proof loses." *Brown*, 817 F.3d at 1234 (citing *Simmons v. Blodgett*, 110 F.3d 39, 42 (9th Cir. 1997)). All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Hansberry v. Lee*, 311 U.S. 32, 40-41 (1940). A district court that has doubts about whether "the requirements of Rule 23 have been met should refuse certification until they

---

[7]    In their Statement of Material Facts (supporting their summary judgment motion), Plaintiffs say that the Court previously "rejected" the defense standing argument. [ECF No. 153, ¶ 11]. This representation is only partially correct, but it is potentially misleading. The Court did not at the pleadings stage agree with the defense theory because it was required to take the allegations as true. But the Court need not adopt that perspective any more. Indeed, the Court is now required to scrutinize the allegations and, if necessary, to determine whether they are, in fact, correct.

have been met." Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment; *accord In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

When confronted with allegations like those in this case, a court should consider standing in light of two important considerations. *First*, the plaintiff bears the burden to satisfy the standing requirements. *Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements."). *Second*, these elements are "not mere pleading requirements." *Id*. Instead, a plaintiff must show "each element . . . in the same way as any other matter on which the plaintiff bears the burden of proof." *Id*.

That means the plaintiff must produce "the manner and degree of evidence required at the successive stages of litigation." *Id*. So while "general factual allegations of injury . . . may suffice" at the motion to dismiss stage, a plaintiff cannot rest on those same "mere allegations" at the motion for summary judgment stage. *Id*. (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Because there are three Plaintiffs, the Undersigned will provide a plaintiff-by-plaintiff analysis. *Cf. Thole v. U.S. Bank NA*, 140 S. Ct. 1615, 1619 (2020) (holding that two participants in defined benefit pension plan lacked Article III standing to bring a class action alleging breaches of duties of loyalty and prudence under ERISA by poorly investing the plan's assets).

a. **Bryant**

Bryant alleges that she suffered harm due to a "lapse" in coverage. At the motion to dismiss stage, that was sufficient. It is not sufficient now, however. The evidentiary record submitted to the Court demonstrates that she did not suffer a lapse-in-coverage injury.

Bryant, who holds a master's degree in human resources from Webster University and had swiftly climbed the Walmart career ladder from assistant store manager in 2009, to co-store manager in 2011, to full sole store manager by 2014, knew that Plan coverage would be available to her through her domestic partner upon the termination of her employment. In fact, shortly before her employment ended, Bryant contacted the Plan to discuss the availability of domestic-partner coverage once she left Walmart.

Bryant was informed that she had 60 days after her employment ended (until June 7th) to enroll in domestic partner coverage, and that she could do so as early as the day following her termination. Bryant was also advised that coverage would be retroactively effective so that there would be no break in coverage. Bryant therefore knew that she would avoid any loss of coverage by enrolling by June 7th.

Bryant took advantage of the opportunity well before June 7th. Bryant's last day of Plan coverage was April 13, 2016, the date her Walmart employment ended.  By April 28, 2016, she had secured Plan coverage for herself and her children through her domestic

partner, who was also a Walmart associate.[8] This coverage was effective retroactively to April 14, 2016, the date when her own coverage as a Walmart associate ended, as she had been told.

This result **would have been the same** had Bryant elected COBRA coverage -- her Plan coverage would have been reinstated retroactively to the date her coverage ceased. After an employee loses coverage due to the termination of employment ("a qualifying event"), COBRA regulations require a COBRA election notice to be sent to qualified beneficiaries within 14 days, and then allow qualified beneficiaries an additional 60 days to elect coverage and pay the requisite premium. 29 U.S.C. § 1165(a)(1); 29 C.F.R. § 2590.606-4(b)(1).

If a qualified beneficiary elects coverage and pays the premium in that post-termination period, then coverage is reinstated retroactively to the date coverage otherwise would have been lost. "The structure of COBRA is designed for there to be a temporary gap even when a timely COBRA election is made, and then the gap is closed retroactively once the election is made and the COBRA premiums are paid." [ECF No. 155-6, ¶ 24].

---

[8]      Although Bryant submitted conflicting evidence about the specific date on which she enrolled in domestic partner coverage, she admitted in her deposition that she did so no later than April 28, 2016. That is why the Court is using that date.

As required by the regulation, the Plan, through its COBRA administrator, timely sent Bryant a COBRA election notice within fourteen days following her loss of Plan coverage. That notice specifically advised Bryant that, if she timely elected COBRA coverage, her Plan coverage would be reinstated retroactively to April 14, 2016 (the day after her employment ended). The notice further warned that obtaining coverage through the Affordable Care Act's "Marketplace" could result in a gap in coverage, while electing COBRA coverage would not.

Therefore, if she had elected COBRA, then Bryant would have had the same seamless Plan coverage that she enjoyed when she had earlier enrolled through her domestic partner. In short, Bryant's claim that she was somehow injured by a "lapse in coverage," much less one caused by the COBRA election notice, is refuted by the record. The Court is not obligated at this point to simply accept at face value her allegations when they are contradicted by the actual evidence. Instead, as noted above, the Court is required to actually decide factual controversies (and not accept the class action assertions as necessarily true). *Brown*, F.3d at 1233-34.

Bryant has made a concerted effort to create an injury sufficient to confer standing. For example, contrary to her prior sworn statements, Bryant represented in her class certification papers that her Plan coverage date through her domestic partner was "retroactively applied – but did not become – effective until June of 2016." [ECF No. 107, p. 4]. But that representation is false, and it is indeed contradicted both by

Bryant's responses to interrogatories and by her declaration previously submitted to this Court, where she stated that the supposed "lapse" in her coverage spanned from April 13 through April 28, 2016.

Consistent with those sworn statements, Bryant admitted in her deposition that she obtained Plan coverage through her domestic partner by April 28, if not earlier, and further that her Plan coverage was effective retroactively to the date her employment ended.

Bryant also alluded in her class certification papers to unpaid medical expenses or delayed medical treatment, which is contrary to her sworn interrogatory response stating that she is not seeking to recoup unpaid medical expenses. In any event, Bryant has offered *no* evidence of any unpaid medical expenses or delayed treatment; indeed, she testified that she could recall neither any unpaid medical expenses incurred between April 14 and April 28, 2016 nor any foregone medical attention.

Although Bryant claims that her daughter needed surgery around the time that she separated from employment at Walmart [ECF 107, p. 5], her daughter did not actually have surgery until 2018 -- at least two years after Bryant left Walmart -- even though she and her children had coverage through her domestic partner beginning in April 2016. Thus, there is no credible, evidence-based claim that surgery for Bryant's daughter was postponed because of any alleged "lapse" in coverage.

Bryant's only other claim of injury -- allegedly "higher insurance premiums" that she had to help her domestic partner pay as a result of losing her own insurance -- is unconvincing and factually unsupportable.[9] [ECF Nos. 107, pp. 4, 6; 153, ¶ 53]. In fact, the Plan coverage available to her through her domestic partner was far cheaper than COBRA coverage.  The record shows that COBRA continuation coverage would have cost Bryant $1,145.89 each month. [ECF 145-2, p. 4]. Her domestic partner's premium payment increased by only $171.82 per month when she and her children were added to his Plan coverage.  Bryant nevertheless testified that her domestic partner's coverage was somehow more expensive once she and her children were placed on his plan.

She attributed the "change in cost" to two factors: (1) an additional adult (Bryant) was added to her domestic partner's coverage; and (2) a tax that was imposed.  But an additional cost to cover Bryant[10] through her domestic partner's Plan coverage does not constitute "injury" where she would have incurred an *even higher cost for COBRA coverage*.

With respect to the tax, Bryant was referring to a federal tax imposed on income imputed to her domestic partner (to account for Walmart's contribution to the cost of

---

[9]     Similar to medical expenses, Bryant does not assert a claim for injury due to higher insurance premiums in her Second Amended Complaint.

[10]    Three additional persons were covered under Bryant's domestic partner's coverage, including her children, although she maintained that the addition of children did not affect the premium.

her domestic partner's added coverage for her and her children) because they were not then legally married. Even after accounting for any federal tax imposed on imputed income, Bryant's domestic partner's *total cost* to provide Plan coverage to Bryant and her children could not have exceeded $278.82 per month. Bryant cannot create a standing injury with vague assertions of "higher insurance premiums" where the evidence shows that COBRA coverage would have cost *more than four times* the cost of the Plan coverage she obtained through her domestic partner.

### b.  Baker and Smith

Baker and Smith were added as Plaintiffs in the Second Amended Complaint, apparently in an effort to proceed with a plaintiff who has standing, given Bryant's myriad standing-related obstacles. But these two new plaintiffs lack standing as well.

Baker was terminated for cause by Walmart. During his deposition, he confessed that he was so angry at Walmart, he neither read the entirety of the COBRA election notice, nor had any intention of continuing his relationship with Walmart through electing COBRA. Baker also did not have any unpaid medical expenses, nor did he forego medical care during the period he was without health coverage.

Meanwhile, Smith likewise cannot show any economic harm resulting from the COBRA notice. While Smith testified that she incurred approximately $1,000 in unpaid medical bills in the months following her termination from Walmart, Smith knew even before she received her COBRA notice that she could not afford COBRA coverage. Thus,

it was COBRA's cost and Smith's own economic circumstances -- and not the COBRA

election notice -- that resulted in these expenses.  Consequently, she cannot show an

economic injury related to the COBRA notice, which means she has not established

standing. In her declaration, Smith asserted that the alleged deficiency in the COBRA

notice caused her to lose coverage, but she was unable to explain how or why when asked

about it at her deposition. Specifically, she said she could not substantively respond to

the following question: "is there something about the COBRA notice that was wrong that

caused you to lose your insurance?" [ECF No. 106-1, p. 87]. She also said she "probably

didn't understand why that was written" when asked about her declaration's reference

to a deficient COBRA notice. *Id.*

### c.  What About The "Informational Injury" Theory?

Judge Martinez's Order on the dismissal motion did not decide on the validity of

the informational injury theory. [ECF No. 64, p. 5]. The Order noted that Bryant asserted

two standing theories: informational injury (the purportedly deficient notice) and an

economic injury (the so-called lapse in insurance coverage). The Order expressly noted

it was not determining whether the alleged informational injury "is sufficient to confer

standing in and of itself," and then issued the ruling on the alleged lapse in coverage

because the Court accepted the allegations as true "at [that] stage in the proceedings." *Id.*

Therefore, the informational injury theory is ripe for a ruling.

At bottom, none of the named plaintiffs relied in any way on the notice they claim

caused a purported informational injury.

Assuming, for the sake of discussion, that the COBRA election form violates a federal regulation, this alone does not generate Article III standing. "Plaintiffs do not 'automatically satisf[y] the injury-in-fact requirement whenever a statute' grants them the right to sue." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1268 (11th Cir. 2019) (quoting *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016)).

In *Spokeo*, the Supreme Court made clear that "Article III standing requires a **concrete injury even in the context of a statutory violation**." 136 S. Ct. at 1549 (emphasis added); *see also Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) (rejecting participants' argument that Article III's injury-in-fact requirement was satisfied simply because ERISA afforded them "a general cause of action to sue for restitution . . . and other equitable relief"). This is because "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

Consistent with *Spokeo*, courts within the Eleventh Circuit have dismissed cases for lack of Article III standing where a plaintiff has alleged nothing beyond a bare procedural or technical injury.

In *Cordoba*, for example, the Court held that consumers who never asked to be placed on a broadcast satellite service provider's internal do-not-call list lacked standing to maintain a claim under the Telephone Consumer Protection Act ("TCPA") based on

allegations that the provider failed to institute appropriate procedures to maintain an internal list. 942 F.3d at 1272. Likewise, the Court in *Salcedo v. Hanna* dismissed a TCPA claim premised on the receipt of a single text message for lack of standing, holding that the text message did not rise to the level of concrete injury-in-fact. 936 F.3d at 1168.

Mirroring a perspective that a technical violation is, without more, insufficient to generate standing, the Court in *Nicklaw v. CitiMortgage, Inc.* held that, even though a New York law requiring recordation of a discharge certificate created a substantive right, the plaintiff had not suffered a concrete injury because the defendant's unlawful delay in recording the certificate did not cost the plaintiff money or lower his credit score. 839 F.3d 998, 1000, 1003 (11th Cir. 2016); *see also Zia v. CitiMortgage, Inc.*, 210 F. Supp. 3d 1334, 1336 (S.D. Fla. 2016) (finding plaintiff lacked standing to pursue claim for statutory penalties based on alleged failure to timely record mortgage satisfaction).

To be sure, Congress can elevate a statutory violation to a concrete injury sufficient for Article III standing, but an injury still "must actually exist." *See Spokeo*, 136 S. Ct. 1549. For such injury to exist, the alleged statutory violation must "pose a risk of real harm" to a concrete interest. *Id.* at 1549. In that respect, the *Spokeo* Court acknowledged that the statute at issue (the Fair Credit Reporting Act) was enacted to "curb the dissemination of false information," but noted that "not all inaccuracies cause harm or present a material risk of harm." *Id.* at 1550.

To establish injury from a statutory violation, the plaintiff must show the precise harm or a heightened risk of the harm that the statute was designed to prevent. *See Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016) (citations omitted) ("[E]ven where Congress has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest.").

COBRA's purpose was to safeguard a participant's right to obtain continuation coverage, in response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R. REP. NO. 241, 99th Cong., 2d Sess. at 44 (1985) *reprinted in* 1986 U.S.C.C.A.N. 42, 579, 622; *see also Phillips v. Saratoga Harness Racing, Inc.*, 240 F.3d 174, 179 (2d Cir. 2001). The objective of COBRA is to allow individuals the opportunity to elect temporary continuation coverage. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1230 (11th Cir. 2002) ("The notice must be sufficient to permit the discharged employee to make an informed decision whether to elect coverage.").

In her Reply submitted in support of the class certification motion, Bryant represented that "Plaintiffs have affirmatively excluded those putative class members who would lack standing . . . (i.e., those individuals . . . who received the form but elected COBRA coverage"). [ECF No. 107, p. 8].

36

Even if Plaintiffs' receipt of the allegedly deficient COBRA election notice could give rise to some sort of "informational injury," Plaintiffs still would have to prove that they "suffer[ed], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); *see also Spokeo*, 136 S. Ct. at 1549 (stating a plaintiff must show more than simply a violation of a statutory right to establish injury in fact).

Although Plaintiffs claim that the COBRA election notice was deficient in failing to identify the Plan administrator, there is simply no evidence that this supposed deficiency interfered in any way with their right or ability to elect continuation coverage.[11] The COBRA election notice plainly had no impact whatsoever on Bryant's decision to secure Plan coverage through her domestic partner at less than one fourth the cost of COBRA coverage.[12]

There is likewise no evidence that Baker had any questions about the notice or his rights to COBRA continuation coverage, much less that he would have elected COBRA if he had been provided with the allegedly missing information. In fact, Baker

---

[11]   This point will be discussed in greater detail in the next section, entitled "Lack of Causation."

[12]   Bryant admitted that she understood the parts of the COBRA notice directing her to contact CONEXIS with any COBRA-related questions. The COBRA notice also indicates that recipients may contact Walmart Benefits to request a copy of the Associate Benefits Book, which contained information concerning COBRA.

conceded that he did not even read most of the notice, as he wanted nothing more to do with Walmart, including signing up for COBRA.

Similarly, there is no evidence that Smith attempted to contact the COBRA administrator or anyone else with questions about the notice or her COBRA rights, or that she even had any such questions. *See Spokeo*, 136 S.Ct. at 1549.

Thus, all three named Plaintiffs have demonstrated, at most, a technical, procedural violation which did not cause them actual harm. This is not the type of informational injury which can confer standing. *Trichell v. Midland Credit Mgmt., Inc.*, No. 18-14144, 2020 WL 3634917, at *8 (11th Cir. July 6, 2020) (finding two recipients of allegedly misleading debt collection letters lacked Article III standing to pursue claims under the Fair Debt Collection Practices Act because the collection letters did not cause them any tangible injury and the two plaintiffs asserted only intangible injuries in the form of FDCPA violations);[13] *see also Jewell*, 828 F.3d at 990 (affirming order dismissing complaint by environmental advocacy group because the group did not suffer informational injury required to establish the requisite standing).

### d.  Did the COBRA Notice Cause an Injury (Assuming There Was One)?

Even if Plaintiffs could show injury, they cannot demonstrate the second prong of standing -- that any harm they allegedly suffered is fairly *traceable* to the alleged

---

[13]     The Eleventh Circuit's very recent opinion in *Trichell* cites *Thole* for the rule that a "cause of action does not affect the Article III standing analysis." 2020 WL 3634917, at *5 (citing *Thole*, 140 S. Ct. 1615, 1620).

deficiency in the COBRA election notice. Phrased differently, they have not demonstrated (as opposed to merely alleging) that the so-called defective COBRA notice proximately caused them any concrete injuries.

The evidentiary record forecloses any claim that Bryant suffered a "lapse" in coverage as a result of the alleged COBRA notice deficiency.

Bryant understood the portions of the COBRA notice directing her to contact CONEXIS with COBRA-related questions, which she could have done if she wanted to ask questions about the COBRA coverage.

As explained previously, Bryant indisputably would have experienced the same "lapse" (which was no lapse at all) even if she had elected COBRA coverage. Moreover, Bryant had *already* secured coverage under her domestic partner's Plan coverage by the time she received her COBRA election notice. Therefore, a COBRA notice that Bryant had not yet received, whether deficient or not, could not have influenced her decision to enroll herself and her children through her domestic partner's Plan coverage.

The two newly-added Plaintiffs, Smith and Baker, have similarly not established any injury which can be traced to a deficient COBRA notice which provided contact information for the COBRA administrator, rather than the Plan administrator.

Smith knew before receiving her COBRA election notice that she could not afford COBRA. That economic reality makes any technical deficiency in the notice irrelevant, and also demonstrates that she lacks a concrete injury caused by the violation to

establish standing. Smith could not have afforded the coverage even if she had received a dozen perfectly-compliant COBRA notices. So the Undersigned views this issue as a red herring and concludes that Smith did not sustain a concrete injury caused by the omission of contact information in the COBRA notice.

Baker did not even read most of the COBRA notice and thus cannot show that information supposedly missing from it caused him any sort of harm. In fact, Baker was unable to explain the injuries he incurred, other than discussing the various disadvantages to being without health coverage.

Not one of the three named Plaintiffs claim that they would have (or could have) elected COBRA had they been provided with the allegedly missing information. Nor have they otherwise demonstrated any causal connection between the alleged COBRA notice deficiency and any harm (economic or "informational") that they claim to have suffered.[14]

Because they lack standing, the three named Plaintiffs cannot serve as the named representatives for a putative class action, and the Undersigned therefore recommends

---

[14]   The Undersigned finds persuasive an argument asserted by Retail Litigation Center, Inc. in its *amicus curiae* memorandum: "Nor does it make sense that a plaintiff would suffer any harm—informational or actual— from notices like the ones in this case. A notice that gives the name and contact information of an expert third-party administrator, when that is *exactly* the best entity for the employee to call for information about COBRA or the employee's status, creates no harm." [ECF No. 159-1, p. 12].

that Judge Martinez deny the motion for class certification. *See generally Thole*, 140 S. Ct. 1615; *Spokeo*, 136 S. Ct. 1540, *Trichell*, 2020 WL 3634917. *See generally Nicklaw*, 839 F.3d at 1003 (holding that, in federal court, "the requirement of concreteness under Article III is not satisfied every time a statute creates a legal obligation and grants a private right of action for its violation," and noting that "a plaintiff must suffer some harm or risk of harm from the statutory violation to invoke the jurisdiction of a federal court").

Given this conclusion that the three Plaintiffs lack standing, the Undersigned does not need to evaluate the other class action factors.

Nevertheless, in an abundance of caution, the Undersigned will also evaluate two additional Rule 23(a) factors concerning class certification because they relate to the Plaintiffs' failure to establish standing: whether the claims are typical and whether the named representatives will adequately represent the putative class.

### e.   Rule 23(a) Prerequisites

The Rule 23(a) prerequisites for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.

#### i.   Typicality

To satisfy typicality, a class representative must possess the same interest and suffer the same injury as the class members.  *See Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

Rule 23(a)(3) typicality is satisfied where a plaintiff's claims are "reasonably co-

extensive" with absent class members' claims; they need not be "substantially identical." *In re Checking Account Overdraft Litig.*, 281 F.R.D. 645, 675 (S.D. Fla. 2012). The test of typicality is whether "plaintiff's claim arises from the same event or practice or course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory." *Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695-CIV, 2013 WL 3463489, at *4 (S.D. Fla. July 3, 2013).

Plaintiffs propose two putative classes: participants who received a COBRA election notice in 2016 and did not elect coverage, and participants who received a COBRA election notice between 2013-2015 and did not elect coverage. All three named Plaintiffs are members only of the first putative class, thus defeating the requirement set forth in *Dukes* and Eleventh Circuit precedent that a class representative be a member of the class she seeks to represent. *See Dukes*, 564 U.S. at 348-49; *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1307 (11th Cir. 2008). Even if Judge Martinez were to otherwise finds class certification appropriate, without a class representative, **the 2013-2015 subclass cannot be certified**.

ii. <u>Adequacy</u>

The "'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representative[] and the class; and (2) whether the representatives will adequately prosecute the action.'" *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal citation

omitted). "If **substantial** conflicts of interest are determined to exist among a class, class certification is inappropriate.'' *Id.* (emphasis added).

A party who is not familiar with the basic elements of his claims is not considered to be an adequate representative for the class because there is no sense that there is an actual party behind counsel's prosecution of the action. *Burkhalter Travel Agency v. MacFarms Intern., Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991). A plaintiff is an inadequate representative where he is so unfamiliar with the case that he will not serve the necessary role of "check[ing] the otherwise unfettered discretion of counsel in prosecuting the suit." *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (citations omitted); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (internal citation omitted) ("[C]lass representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.").

In considering the involvement and knowledge of a prospective class representative, "[t]he Court must feel certain that the class representative will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class." *Koenig v. Benson*, 117 F.R.D. 330, 333-34 (E.D.N.Y. 1987).

The Undersigned finds that Plaintiffs and their counsel *will* fairly and adequately protect and represent the interest of each class member.

No substantial conflict of interest appears to exist between Plaintiffs and other class members.

Plaintiffs have diligently pursued this litigation on behalf of the classes and they retained a firm which has extensive class action experience related to deceptive trade practices. In addition, they attended two mediations and also provided deposition testimony.

The Undersigned is *not* persuaded by Defendants' argument that Plaintiffs lack knowledge of the case. A class representative is not required to become a legal expert or independently investigate his claims. "Merely relying on counsel to prosecute an action does not make a lead plaintiff inadequate." *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, No. 17-cv-02207, 2019 WL 3449671, at *6 (N.D. Ga. July 17, 2019) (granting class certification motion in lawsuit against global provider of workforce payment product for false statements about its revenue growth while omitting that its growth was derived from fees and for a predatory fee scheme).

Further, Plaintiffs' deposition testimony demonstrates that they sufficiently understand the claims, conferred with counsel, and provided testimony.

Plaintiffs are adequate because they have "a very thorough understanding of the nature of this litigation and [their] role[s] as class representative[s]." *Brown v. Brewer*, No. CV 06-3731-GHK(JTLX), 2009 WL 1574556, at *4 (C.D. Cal. May 29, 2009) (finding that plaintiff was adequate "although Plaintiff could not remember some key elements of his

case" and "referred to [a] nine[-]page memorandum" provided by counsel at deposition"); *see also Jimenez v. Menzies Aviation Inc.*, No. 15-cv-02392, 2016 WL 3231106, at *6-7 (N.D. Cal. June 13, 2016).

As a practical matter, of course, the mere fact that the three Plaintiffs meet the adequacy element of Rule 23(a) is entirely academic here, as they lack the requisite standing and also fail to meet the typicality requirement for one of the two subclasses.

## V.   CONCLUSION

The Undersigned **respectfully recommends** that the District Court **deny** without prejudice the class action certification motion because the three named Plaintiffs lack the requisite standing.

## VI.   OBJECTIONS

The parties will have fourteen (14) days from the date of this Report and Recommendations within which to file written objections, if any, with United States District Judge Jose E. Martinez. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary

in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985);

*Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on July 15, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Jose E. Martinez
All Counsel of Record

46